**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

|  |  |
|---|---|
| IN THE MATTER OF THE SEIZURE OF THREE CRYPTOCURRENCY WALLETS AND EIGHT BINANCE ACCOUNTS | Case No. 5:23-mj-5343<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS**

I, Matthew Resch, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      This affidavit is submitted in support of the applications made by the United States for a seizure warrant authorizing the seizure of cryptocurrency from the following eleven accounts ("Subject Accounts"):

A.  The Subject Accounts include the following three the cryptocurrency wallets ("Subject Wallets"):

  a.   The Bitcoin wallet with root address

      bc1qcghwt3lszffn8panpp2nu60djzqpryrrkvsucd ("bc1q…sucd");

  b.   The Monero wallet with root address

      45VK4jd9EsHSb2S1XBPYmEVXP36AXc7WaNyoX7QPQ5rFdEYYsTVhF

      FvVDsxhvfF9H41hFFBwd5ajicQPwh9fR9V71G21pK8 ("45VK");

  c.   The Monero wallet with root address; and

      42B1jUP4rMDPrneqxgizKze4RCMMRDbqcgrFeqA9LRzsC2Xa38n61UrB4t

      SCn17LzSViAGR6A2eR3LbcTm17h9shEV7gwWY ("42B1").

B. The Subject Accounts also include the following eight of Binance accounts ("Subject Binance Accounts"):

    a. The Binance account with User ID 722144803;

    b. The Binance account with User ID 722142351;

    c. The Binance account with User ID 557665756;

    d. The Binance account with User ID 566506366;

    e. The Binance account with User ID 566628241;

    f. The Binance account with User ID 566926545;

    g. The Binance account with User ID 550483199; and

    h. The Binance account with User ID 467081595.

2. For the reasons stated herein, there is probable cause to believe that these monies are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) as property involved in a money laundering offense under 18 U.S.C. §§ 1956(a)(3), 1956(a)(1)(B)(i), and (h). There is also probable cause to believe that these funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 as proceeds of a conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. §§ 371 and 1960. The undersigned affiant requests a warrant to seize this property that is subject to forfeiture pursuant to 18 U.S.C. § 981(b) 21 U.S.C. § 853(f).

## AFFIANT'S BACKGROUND

3. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since December 2020. I have received training in computer intrusion investigations, to include the role of electronic communications providers and the internet in cyber-criminal

activity. I am currently assigned to the FBI Louisville Cyber Task Force to investigate computer intrusions and the infrastructure that supports them, to include cyber-enabled fraud money laundering. I was previously a Computer Scientist with the FBI, and received training in digital forensics, malware, computer operating systems, and computer networking.

4.     The statements made within this affidavit are personally known to me, based upon my own investigations including witness interviews and record reviews, as well as information obtained from other law enforcement agents.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## LEGAL BACKGROUND

5.     Relevant to this application, a person violates 18 U.S.C. § 371 when two or more persons conspire either to commit any offense against the United States, or to defraud the United States or any agency thereof in any manner or for any purpose.

6.     Relevant to this application, a person violates 18 U.S.C. § 1960 when he or she knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, which is defined as a business that transfers funds on behalf of the public, by any and all means; that affects interstate or foreign commerce; and that is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or felony under State law, fails to comply with registration requirements under 31 U.S.C. § 5330 or the regulations prescribed under that section, or otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

7.	Relevant to this application, a person violates 18 U.S.C. § 1956(a)(1)(B)(i) when he or she conducts or attempts to conduct a financial transaction involving the proceeds of specified unlawful activity knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful activity. A person violates 18 U.S.C. § 1956(a)(3) when he or she conducts or attempts to conduct a financial transaction involving property represented to be proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity, conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity, or avoid a transaction reporting requirement under State or Federal law.  A person violates 18 U.S.C. § 1956(h), when he or she conspires to commit any offense under § 1956.

8.	Relevant to this application, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1), the United States may pursue civil or criminal forfeiture of property involved in violations of 18 U.S.C. § 1956 or property traceable to such property. *See United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. Apr. 16, 2012) ("Money laundering forfeiture is required for all property 'involved in' the crime, which can include clean or legitimate money that is comingled with tainted money derived from illicit sources.").   In addition, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, the United States may pursue civil or criminal forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. §§ 371 and 1960.

4

9.    Property subject to forfeiture may be seized pursuant to a warrant based on probable cause pursuant to 18 U.S.C. § 981(b) for a civil seizure warrant and pursuant to 21 U.S.C. § 853(f) (by 18 U.S.C. § 982(b)(1)) for a criminal seizure warrant. Section 853(f) provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that a[] [protective] order under [21 U.S.C. § 853(e)] may not be sufficient to assure the availability of the property for forfeiture."

10.    Based upon my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that ANURAG MURARKA has violated 18 U.S.C. § 1960 (Unlicensed Money Transmitting Business), 18 U.S.C. § 371 (Conspiracy to Defraud the United States), and 18 U.S.C. §1956 (Money Laundering).  There is also probable cause to believe that the Subject Accounts are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 982(a)(1), and 28 U.S.C. § 2461, as having been involved in the money-laundering violations and/or as proceeds of the conspiracy to operate an unlicensed money transmitting business. Computer fraud in violation of 18 U.S.C. § 1030 and narcotics trafficking in violation of 21 U.S.C. §§ 841 and 843 constitute the underlying specified unlawful activities (SUAs) which give rise to the money-laundering offenses, the predicate offenses that justify the seizure of funds in the Subject Accounts identified in this investigation. Finally, as set forth below, there is a substantial risk that the Subject Accounts will be withdrawn, moved, dissipated, or otherwise become unavailable for forfeiture unless immediate steps are taken to seize them. I submit that a protective order under 21 U.S.C. § 853(e) would not be sufficient to ensure that the Subject Accounts will remain available for forfeiture.  The funds are in the form of cryptocurrency,

which anyone with access to the public and private key can move at any time. As to the Subject Wallets, the cryptocurrency is stored on the cloud, and there is no entity or institution upon which to serve a restraining order other than the target of our investigation, who is not someone upon which we can reasonably rely.

## CRYPTOCURRENCY BACKGROUND

11.     Bitcoin ("BTC") is a decentralized virtual currency, which is circulated over the Internet, but which is not backed by a government. BTC is supported by a peer-to-peer network. All transactions are recorded on BTC's public ledger, called the blockchain. Although transactions are visible on the public ledger, each transaction is only listed by a complex series of letters and numbers that does not identify the individuals involved in the transaction. This feature makes virtual currency transactions pseudo-anonymous; however, it is sometimes possible to determine the identity of an individual involved in a virtual currency transaction through several different tools that are available to law enforcement. For this reason, many criminal actors who use virtual currency to facilitate illicit transactions online (e.g., to buy and sell illegal drugs or other unlawful items or services) look for ways to make their transactions even more anonymous.

12.     BTC is sent to and from virtual currency "addresses," roughly equivalent to anonymous account numbers. A virtual currency address is a unique token; however, BTC are designed such that one person may easily operate many such accounts. Like sending and receiving an email via an email address, a user can send and receive BTC via a BTC address. People commonly have many different BTC addresses, and an individual could theoretically use a unique address for every transaction in which they engage. A user can also send BTC from

multiple addresses in one transaction; however, to spend virtual currency held within a BTC address, the user must have a private key, which is generated when the address is created and is shared only with the address key's initiator. Similar to a password, a private key ensures secured access to the virtual currency. Consequently, only the holder of a private key for a virtual currency address can spend from the address. Although the owners of virtual currency addresses generally are not known unless the information is made public by the owner (e.g., by posting the address in an online forum or providing the address to another user for a transaction), analyzing the blockchain can sometimes lead to identifying both the owner of an address and any other accounts that the person or entity owns and controls.

13. Virtual currency is often transacted using a virtual currency exchange ("VCE"), which typically acts as a trading platform and storage platform. Most VCEs facilitate trading between the U.S. dollar, other fiat currencies, BTC, and other virtual currencies. Many VCEs also store their customers' virtual currency in virtual currency "wallets" . These wallets can hold multiple BTC addresses associated with a user on a VCE's network.  Binance, as referenced in this affidavit, is one such VCE.

14. Because these VCEs act as money services businesses, they are legally required, under the Bank Secrecy Act, codified at 31 U.S.C. § 5311 et seq., to conduct due diligence of their customers (i.e., Know Your Customer ("KYC") checks). They are also required to have anti- money laundering ("AML") programs in place. In other words, a VCE operating in the U.S. is required to collect identifying information of their customers and verify their clients' identities.

15. Since the BTC blockchain serves as a searchable public ledger of every BTC transaction, investigators may trace transactions to VCEs. For example, because those VCEs collect identifying information about their customers, subpoenas or other appropriate legal process submitted to these VCEs can, in some instances, reveal the true identity of the individual responsible for the transaction.

16. While the identity of a BTC address owner is generally anonymous, law enforcement can often identify the owner of a particular BTC address by analyzing the BTC blockchain. The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, 1 BTC wallets hosted by third parties (e.g., VCEs) are sometimes called "hosted wallets," because the third party holds a customer's funds on the third party's platform until a customer requests that the third party release the funds for a transaction. This is similar to the relationship a customer has with a bank: the bank holds the customer's funds until the customer requests a transfer. In contrast, virtual currency wallets that allow a user to exercise total, independent control over their funds (i.e., do not require a third party's involvement to facilitate a transaction) are called "unhosted" or "self-hosted" wallets. it will often combine its [BTC] addresses into a separate, central [BTC] address (i.e., a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open-source tools and private software products can be used to analyze a transaction." United States v. Gratkowski, 964 F.3d 307, 309 (5th Cir. 2020).

17. Law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies

analyze the BTC blockchain (as well as the blockchains for other virtual currencies) and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable.

18.     The third-party blockchain-analysis software utilized in this case is an anti-money laundering software provided by Company A. This software is used by financial institutions and law enforcement organizations worldwide. This third-party blockchain analysis software has supported many investigations and has been referenced in numerous search and seizure warrants, and as such, has been found to be reliable. Law enforcement has been able to verify the reliability of this software by ex-post analysis. For example, in an unrelated case where the government used Company A's clustering software, the government's blockchain analysis identified over 50 customers of a darknet child pornography site. In each one of the 50 subsequent law enforcement actions, the blockchain analysis was corroborated by statements and search warrant returns from the targets' devices. In sum, this software has correctly analyzed data on the blockchain in hundreds of investigations, and I have assisted or been briefed on many of these investigations.

**PROBABLE CAUSE**

### I.  Money Laundering and Unlicensed Money Transmitting

19.     The investigation relates to the illegal exchange of cash for virtual currency conducted on online marketplaces known for criminal activity.  In April 2021, the FBI identified a vendor using the moniker "elonmuskwhm" on criminal darknet marketplaces, White House Market and Dark0de Reborn, and the peer-to-peer exchange, LocalMonero, offering to mail

customers cash within the United States in return for bitcoin.   The advertisements from "elonmuskwhm" indicated he would ship cash using U.S. Postal Service Express Mail or Priority Mail with package tracking available. On Dark0de Reborn, "elonmuskwhm" had four listings for these "cash by mail" exchanges and stated he was the only vendor who could provide up to $1,000,000 per week.  The four (4) listings were priced at $500, $1,000, $5,000, and $10,000. On White House Market, "elonmuskwhm" had five (5) listings priced at $500, $1,000, $2,000, $5,000, and $10,000, respectively, and he stated the shipments would be mailed from the United States.  On May 4, 2021, on the criminal forum Dread, "elonmuskwhm" directed people to not pay taxes by using his/her cash-by-mail service.

20.    Darknet marketplaces like White House Market and Dark0de Reborn, are marketplaces for buying and selling illegal goods and services, and money conversion services, like that offered by "elonmuskwhm," are used to promote specified unlawful activities as defined in 18 U.S.C. § 1956, and to conceal the location, source, ownership, or control of the proceeds of that activity.  A money transmitting business is any business that provides "currency exchange," "money transmitting or remittance services," or that accepts "currency, funds, or value that substitutes for currency and transmits" that "by any means."  31 U.S.C. § 5330(d)(1).  A cryptocurrency exchange service such as that operated by "elonmuskwhm" constitutes a money transmitting business.  As such, "elonmuskwhm" must register his business with the Secretary of the Treasury.  *Id.* at § 5330(a)(1).  The database for money services business registrants contains no registration for "elonmuskwhm", Marc Davis Paolucci, ANURAG MURARKA, or any name found on the shipping materials from "elonmuskwhm". This is a violation of 18 U.S.C. § 1960.

Because "elonmuskwhm" worked with shippers in the United States to send the cash by mail, this amounts to a conspiracy in violation of 18 U.S.C. § 371.

21.     The FBI and United States Postal Inspection Service have conducted several controlled sales of cryptocurrency with "elonmuskwhm". Each time, "elonmuskwhm" shipped cash through the mail to a Post Office box in the Eastern District of Kentucky, in exchange for a pre-determined amount of cryptocurrency. For example, on January 3, 2023, the FBI conducted a purchase of approximately $70,000 from "elonmuskwhm." On January 4, 2023, the FBI conducted surveillance of the mailing of this purchase, and observed a known suspect, Davis Paolucci, exit his residence at ███████████████████████████████, and deliver two parcels to a United States Post Office addresses to the Post Office box provided by the FBI. The parcels were searched upon arrival in the Eastern District of Kentucky and were found to contain the cash negotiated in the communications with "elonmuskwhm."

22.     While discussing one of the controlled sales of cryptocurrency with "elonmuskwhm", an FBI employee told the user that the cryptocurrency being transferred was derived from the proceeds of drug sales. "Elonmuskwhm" responded that drugs were how most of his clients made money, and that his richest clients are hackers. I have identified multiple FBI investigations with subjects that received cash parcels by mail from "elonmuskwhm" and been briefed on the investigations. The various subjects of the investigations were involved in cryptocurrency theft, computer intrusions, and dark-web sales of controlled substances.

23.     On February 2, 2023, Paolucci was indicted for violations of 18 U.S.C. §§ 1956(h) and 371. The 18 U.S.C. § 371 offense was predicated on illegal conduct under 18

11

U.S.C. § 1960 (Unlicensed Money Transmitting Business).  On February 7, 2023, Paolucci was arrested by the FBI.  Approximately $600,000 was located during a search of his residence.

24.    **The CHS** ███████████████████████

████████████████████████ stated he meets various individuals approximately three times a week to receive cash in amounts typically ranging between $100,000 and $300,000 at a time for the purpose of fulfilling cash shipment orders. The CHS explained that the cash exchanges are arranged via WhatsApp chats.

25.    The CHS also described the tradecraft used during cash exchanges. Prior to an exchange, Telegram user "nomorehardwork", known to The CHS as the same user as "elonmuskwhm", requested that The CHS send him a picture of a "note" for pickup. The "note" is a US bank note. The CHS took a picture of a $1 or $5 bill in his possession and sent the picture to "nomorehardwork" on Telegram. Later, a WhatsApp user contacted The CHS to set up a cash exchange (the "In-Person Exchanger"), sending him a text message with the serial number from the bill provided to "nomorehardwork" by The CHS During the exchange, The CHS provided the original bill with matching serial number to the In-Person Exchanger, in order to receive the cash. On at least one occasion, "nomorehardwork" sent a picture to The CHS of the bill in the lap of an unknown person following an exchange. In summary, the message exchange is as

follows:



26.    Based on my training and experience, I know that in order to operate anonymously, cyber-criminal actors frequently utilize tradecraft to positively identify themselves and their co-conspirators to one another without providing much personally identifying information, and to verify the validity of their communications and activity. It is likely that the dollar bill tradecraft uses the serial number as a means of three-way identification for "nomorehardwork," The CHS and the In-Person Exchangers. The system relies on "nomorehardwork" communicating with both parties conducting the cash exchange.

27.    The CHS reviewed his WhatsApp account and identified the WhatsApp accounts belonging to the In-Person Exchangers or those responsible for arranging cash exchanges. Among those users were +1 9293468117, who The CHS identified as the most frequent In-Person Exchanger, and +91 7859857089, identified by The CHS as an individual who arranges cash exchanges, but does not conduct them personally.  Upon application of the United States, on February 8, 2023, this Court entered an order authorizing installation and use of a pen/trap device to monitor non-content information associated with these numbers, among others identified by The CHS

28.    Under the guidance of the FBI, The CHS has continued to engage in cash pickups.

Continued FBI surveillance of cash exchange dates and times were compared with analysis of data received through the aforementioned pen/trap device. Pen/trap data was reviewed for ten cash exchanges during which approximately $2 million was delivered. Following seven of the exchanges, within two hours following each cash exchange, WhatsApp data showed a pattern of activity in which the +1 9293468117 In-Person Exchanger sent *an image* to WhatsApp user +91 7859857089 following the exchange. WhatsApp user +91 7859857089 then sent *an image* to WhatsApp user +91 9867615027.

29.     A search warrant was executed for the contents of the Apple account associated with phone number +91 9867615027, which Apple records indicate belongs to Anurag Murarka. Those contents included backups of WhatsApp messages for the +91 9867615027 account, which confirmed that the +91 7859857089 user regularly sent images of dollar bills to Murarka. The account also contained evidence connecting Murarka to the "elonmuskwhm" moniker, including a folder titled "ElonMusk" that contained public and private encryption keys known to have been used by "elonmuskwhm".

30.     Phone number 9867615027 was listed as a contact number on three non-immigrant visa applications for Anurag Pramod Murarka, date of birth The CHS in July and August, 2022, and August 2023. All three applications listed home address The CHS India The CHS The date of birth and address listed on the applications match those in the +91 9867615027 Apple account. Two applications listed an additional contact phone number, 8097883557.

31.     Open-source research identified a Telegram account using phone number +918097883557 and username "elonmuskwhm", with a profile picture of a phone with a Batman

phone case and the display name "Elon". The FBI and United States Postal Inspection Service has conducted a controlled purchase and other communications with "elonmuskwhm" through a Telegram account bearing the same username, profile picture, and display name.

32.    Apple records, the content of the 919867615027 Apple account, and U.S. visa application information demonstrate that the phone number and WhatsApp account +91 9867615027 belong to Anurag Murarka, who also operates the "elonmuskwhm" moniker.  On August 24, 2023, Murarka was indicted for violations of 18 U.S.C. §§ 1956(h) and 371.

33.    Murarka's Apple iCloud content also contained cryptocurrency wallet seed phrases.  A seed phrase is a representation, usually in the form of a sequence of words, of the key used to generate a cryptocurrency wallet. Control of a seed phrase is the only prerequisite for control of the associated wallet unless additional protections are put in place. With a seed phrase, Murarka, or anyone else with possession of the seed phrases, could reconstitute and have complete control and access over a cryptocurrency wallet.  Through lawful process, the FBI was authorized to use the seed phrases in Murarka's iCloud account to reconstitute the associated cryptocurrency wallets.  No additional protections were in place for the seed phrases described below, and the FBI was able to reconstitute the associated wallets and review their transaction history through valid legal process.

34.    Cryptocurrency tracing conducted on those transactions revealed that at least four of the wallets were used to send and receive cryptocurrency associated with the "elonmuskwhm" cash-for-cryptocurrency money laundering scheme, including transactions associated with controlled cryptocurrency sales by the FBI.  For example, one seed phrase was used to reconstitute the BTC wallet with root address bc1qahywg4yyvzagtvdca2ql5k3zr54hwyzcvevmgr

(bc1q…vmgr).  On April 25, 2022, at the direction of "elonmuskwhm", the FBI sent 0.04998488 BTC to address bc1qycy7rtepltmd7drngwcna2nutq700cwe64h8h8, which is within the bc1q…ymgr wallet.  On April 26, 2023, BTC was sent from the bciq…ymgr wallet to the Binance account with User ID 385503455.

35.    Records from Binance showed that the user of the Binance account with User ID 385503455 registered an address in the Odisha region of India. Within days of account creation using one device, the account holder requested and received a login and password change, as well as two-factor authentication update from a different device before conducting transactions. This suggests that the Binance account was transferred to another party after account opening.

36.    The previously described blockchain analysis software was used to analyze transactions involving the bc1q…ymgr wallet. The software "clustered" that wallet with the BTC wallet with root address bc1q…sucd. This wallet was also reconstituted using a seed phrase found in notes backed up to Murarka's iCloud account, under the label "BTC 2023".  In the same note, the seed phrase used to reconstitute the Monero Wallet with root address 42B1 was found under the label "Monero 2023".

37.    Similarly, the seed phrase used to reconstitute the Monero Wallet with root address 45VK was found in a note backed up to Murarka's iCloud with account information for the virtual currency exchange AgoraDesk, including the username "La2Nyc".  On its website, Agoradesk boasts, "Looking for a LocalBitcoins analogue to trade Bitcoins peer-to-peer without KYC/AML or verification? Agoradesk is a new P2P platform for trading Bitcoin that was created by the team behind LocalMonero, Monero's equivalent of LocalBitcoins." *See* https://agoradesk.com/localbitcoins-alternative?language=en (last visited Sept. 27, 2023).

"La2Nyc" is another moniker used by "elonmuskwhm". The FBI conducted a controlled transaction with the "La2Nyc" moniker on the virtual currency exchange LocalMonero, and the cash was mailed to the FBI by The CHS as it was in transactions with "elonmuskwhm". The iCloud also contains encryption keys for the La2Nyc moniker stored alongside those for "elonmuskwhm".

38.     The Subject Wallets made deposits to the Subject Binance Accounts. The Binance account with User ID 722144803 received deposits from wallets bc1q…sucd and 45VK. The Binance account with User ID 722142351 received deposits from wallets 42B1 and 45VK. The Binance account with User ID 557665756 received deposits from wallets 42B1 and 45VK. The Binance account with User ID 566506366 received deposits from wallets bc1q…sucd, 42B1, and 45VK. The Binance account with User ID 566628241 received deposits from wallets bc1q…sucd, 42B1, and 45VK. The Binance account with User ID 566926545 received deposits from wallets 42B1 and 45VK. The Binance account with User ID 550483199 received deposits from wallets bc1q…sucd, 42B1, and 45VK. The Binance account with User ID 467081595 received deposits from wallet 45VK.

39.     Cryptocurrency exchange account login credentials were maintained as notes in Murarka's iCloud account. Binance records indicate that many of these accounts received cryptocurrency transactions associated with the four wallets described above.  That is, cryptocurrency was sent by multiple parties to wallets with seed phrases in Murarka's control, and then from those wallets to Binance accounts with login credentials in Murarka's control. While the Binance accounts were registered in other names, there is probable cause to believe that Murarka controlled the Subject Binance Accounts and accessed them from devices that he

controls.  This includes:

    a.  Wallets under Murarka's control funds the Subject Binance Accounts.

    b.  Murarka's iCloud account contained the login credentials for the Subject Binance Accounts.

    c.  Binance records show that the accounts were accessed by devices with user-agent strings consistent with iPhone and MacBook or iPad devices. Records obtained from Google demonstrate that Murarka also accessed his Google account from an iPhone, iPad, and MacBook.

    d.  Consistently, when the Binance Accounts are created by one device, the account holder requests and receives a login and password change, as well as two-factor authentication update from a different device before conducting transactions. This suggests the individual registering the account then transfers the credentials and accessibility to another person.

    e.  As with the 385503455 Binance account that received FBI funds, all accountholder country information is India. All but one of the Target Binance Accounts list the Odisha region of India, or the immediately adjacent region. The account 566506366 does not list a region within India.

40.    In April, 2023, Murarka told and the undercover FBI employee speaking that he had travelled to Australia. On April 12, 2023, WhatsApp records obtained under lawful process show that the account associated with Murarka's phone number was accessed from an Australian IP address. On the same day, an iPhone using the same IP address accessed the Binance accounts with user IDs 557665756 and 566628241. Both of these Binance accounts have received

18

cryptocurrency from the Subject Monero Wallets 45VK and 42B1, and Subject Account 566628241 received from both wallets on the same date as the Australian IP access, April 12, 2023.

## METHOD OF SEIZURE

41.     Based on the foregoing evidence in this joint investigation, I believe there is probable cause to seize the funds in the Subject Accounts.  This is consistent with Rule 41, and the warrant I am applying for would permit seizing funds in the Subject Accounts.

42.     The method of seizure of the Subject Wallets is to reconstitute each wallet using its seed phrase on a government-controlled device and transfer the cryptocurrency balance to a government-controlled wallet.

43.     The method of seizure of the Subject Binance Accounts is service of a warrant ordering transfer of the balance of each account to a government-controlled wallet.

## CONCLUSION

44.     I respectfully submit that there is probable cause to believe that Anurag Murarka has committed criminal violations, including 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1960 (Operating an Unlicensed Money Transmitting Business), and 18 U.S.C. § 1956 (Money Laundering), based on the specified unlawful activities of computer fraud and narcotics trafficking.  I further submit that there is probable cause to believe that the proceeds of these violations, which have been deposited into the Subject Accounts, and/or that the Subject Accounts have been involved in these money-laundering violations.

45.      I am requesting a civil seizure warrant pursuant to 18 U.S.C. § 981(b) and criminal seizure warrant pursuant to 21 U.S.C. § 853(f), because:  (1) there is probable cause to

believe that the property to be seized would  be subject to criminal or civil forfeiture as it constitutes proceeds traceable to violations of 18 U.S.C. §§ 371 and 1960, which is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, and/or property involved in violations of 18 U.S.C. § 1956, which is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1); and (2) as to the criminal seizure warrant, an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture.  An order under § 853(e) may not be sufficient because the property is in the form of cryptocurrency, so anyone with access to the public and private key associated with the Subject Account wallets, including Murarka, may move these funds at any time.  Murarka is not a custodian upon which we cannot reasonably rely.  I know these Subject Accounts have been used in furtherance of unlawful activity, but because funds so frequently enter and leave the accounts, I do not have an up-to-date balance.  Because the cryptocurrency is stored on the cloud, there is no entity upon which to serve a restraining order.  Where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the United States' custody once the warrant is served.

46.     In consideration of the foregoing, I respectfully request that this Court issue eleven warrants to seize funds in each of the Subject Accounts.

Respectfully submitted,

_____
/s/ Matthew Resch
Special Agent Matthew Resch

**Attested to by applicant per FRCrP 4.1 by reliable electronic means.**

_____
UNITED STATES MAGISTRATE JUDGE

20